# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>ANIMAL AND PLANT HEALTH INSPECTION SERVICE, *et al.*<br><br>Defendants. | Case No. 1:18-cv-00646 (TNM) |

## MEMORANDUM OPINION

The Humane Society submitted two Freedom of Information Act requests to the Animal and Plant Health Inspection Service, seeking site-inspection reports and other inspection records for specific animal dealers and exhibitors. The Service released responsive records but redacted significant portions citing privacy concerns. The Humane Society alleges that those redactions are improper, and the parties have filed cross-motions for summary judgment. For the reasons stated below, the Court will grant in part and deny in part both motions for summary judgment.

### I.

Under the Animal Welfare Act ("AWA"), dealers and exhibitors must be licensed by the U.S. Department of Agriculture ("USDA") to market, transport, or exhibit animals. *See* 7 U.S.C. §§ 2133–34. And licensees must comply with the standards promulgated by the USDA for the "humane handling, care, treatment, and transportation of animals." *See id.* §§ 2133, 2143. The Service, a USDA component, administers and enforces the AWA by inspecting licensed facilities and documenting noncompliant activity, among other things. Woods Decl. 1 ¶¶ 6, 70, ECF No. 18-2. Inspectors conduct three types of inspections: pre-licensing inspections, routine

compliance inspections, and focused inspections to follow-up on documented noncompliances. *Id.* ¶ 8.[1]

In 2012, the Service started posting inspection reports online to a searchable database. Def.'s Resp. to Statement of Undisputed Facts ("SUMF Resp.") ¶ 13, ECF No. 22-1. The Service rolled out an updated database in 2017 with new redactions. *Id.* ¶ 15; Woods Decl. 1 ¶ 14. The new database distinguishes between individuals or homestead facilities—businesses co-located with the owner's personal residence—and non-homestead facilities. Woods Decl. 1 ¶¶ 14–16. For example, the public can search for non-homestead businesses using the licensee's name or certificate number. *See* SUMF Resp. ¶ 20. Not so for homestead businesses. *See id.* If someone does a generalized search, *e.g.*, for all licensed dealers in Ohio, the database will return a list of homestead and non-homestead facilities, and for each facility there is a link to the last three years' inspection reports for that facility. *See* USDA Animal Care Public Search Tool, APHIS, https://acis.aphis.edc.usda.gov/ords/f?p=118:203:0 (last visited May 29, 2019).[2] There is no identifying information next to the links for the homestead facilities. *Id.* Meanwhile, non-homestead businesses are identified by name, address, and customer number. *Id.*

The Service also redacts inspection reports on the database differently depending on facility-type. Woods Decl. 1 ¶¶ 14–17. It minimally redacts inspection reports for non-homestead facilities, redacting only the signature of the inspector and the signature and title of the receiving official. *Id.* ¶ 15. For homestead facilities, however, it redacts reports more heavily. *Id.* ¶ 16. The Service also withholds the licensee's name and address, customer ID,

---

[1] The Service has indicated that "[n]one of the records at issue are related to a complaint." Woods Decl. 2 ¶ 27, ECF No. 22-2.

[2] The Court takes judicial notice of the official government documents and other sources from the Service's government website as "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

certificate number, inspection identification number, and site name. *Id.* But in both cases, the Service releases the narrative portion of the report that describes any noncompliant conduct the inspector observed. *Id.* ¶ 17.

\* \* \*

The Humane Society requested "complete copies of all inspection reports from January 1, 2015 to the time the agency fulfill[ed] th[e] request, for any USDA-licensed facilities operating under USDA Certificate No. 52-C-0035." *Id.* ¶ 18.[3] The Service searched its Animal Care Information System for responsive records using the certificate number and pulled responsive records. *Id.* ¶ 42.[4] The search returned 137 pages of inspection records (inspection reports and attached veterinary records), 663 photographs, and 11 videos. *Id.*[5]

The Service released nine pages of inspection records in full but redacted information from the other 127 pages citing FOIA Exemptions 6 and 7(c). *Id.* ¶ 22. For the inspection reports, the Service redacted street addresses and zip codes, signatures of inspectors and facility representatives, the narrative descriptions of the inspections, names of third-parties, inspection identification numbers, month and day of inspection, animal inventories, and certified mail tracking numbers. *Id.* ¶ 48. For the records attached to the inspection reports, such as veterinary records, the Service withheld portions with details that allowed the information to be matched to the inspection reports available on the online database. *Id.* ¶ 54. The Service also withheld in full 663 pages of photographs and 11 videos. *Id.* ¶ 22.

---

[3] This certificate number belongs to the Natural Bridge Zoological Park. *See* Woods Decl. 1, Ex. 6 at 50, ECF No. 18-8.

[4] The Animal Care Information System is the database where inspectors upload inspection reports, photographs, videos, and other records related to inspections conducted at licensed facilities. *See* Woods Decl. 1 ¶¶ 42–43.

[5] One of the 137 pages of inspection records was blank, and the Service removed it. Woods Decl. 1 ¶ 22.

The Humane Society appealed administratively, challenging the agency's application of the exemptions. *Id.* ¶ 24. The Service ultimately released additional portions of 667 pages of records: 663 pages of photographs and 4 pages of veterinary care records. *Id.* ¶ 28. For the photographs, the Service released the licensee's name, the certificate number, and the name of the Service's photographer. *Id.* ¶ 59. But the Service still withheld the contents of the photographs, the descriptions of the photographs, the videos in full, the inspection identification number, and the month and day of the inspection under Exemptions 6 and 7(C). *Id.*

The Humane Society also requested "copies of inspection reports created or obtained in 2016 or 2017" for certain animal dealers: Marvin Burkholder/Berlin Kennel (Certificate No. 31-A-0224) and Owen Yoder (Certificate No. 31-A-0198).[6] *Id.* ¶ 29. The Service pulled responsive records: two pages of records for Berlin Kennel and three pages of records for Owen Yoder. *Id.* ¶ 43.

The Service released all five pages with information redacted under FOIA Exemptions 6 and 7(C). *Id.* ¶ 34. It withheld the same information from those records as it had for the Natural Bridge Zoo request—street addresses and zip codes, the narrative descriptions of the inspections, and so on. *Id.* ¶ 48. The Humane Society administratively appealed the agency's application of the exemptions, but the Service affirmed the withholdings. *Id.* ¶¶ 36, 41.

The Humane Society challenges only the Service's withholdings under Exemptions 6 and 7(C) for both FOIA requests. *See* Compl. ¶¶ 57–76, ECF No. 1; Minute Order June 15, 2018 (dismissing the Humane Society's claim under the Administrative Procedure Act). It does not challenge the adequacy of the Service's search for responsive documents. *See* Compl. ¶¶ 57–76.

---

[6] The Humane Society also requested inspection reports for two other dealers, but the Service has withdrawn its redactions for those dealers, so they are not at issue. *See* Woods Decl. 1 ¶¶ 29, 41; Woods Decl. 2 ¶¶ 15–16, ECF No. 22-2.

## II.

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it can affect the substantive outcome of the litigation. *Liberty Lobby*, 477 U.S. at 248. And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). Or the party may "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.*

Courts can resolve the "vast majority" of FOIA cases on summary judgment motions. *Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). In the FOIA context, the Government is entitled to summary judgment if it establishes beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents. *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007). More, while FOIA permits agencies to withhold information that falls under one of nine specific exemptions, *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010), the agency must "demonstrate that the records have not been improperly withheld," *Ctr. for the Study of Servs. v. HHS*, 874 F.3d 287, 288 (D.C. Cir. 2017) (internal quotation marks omitted). And the Court has an affirmative duty to ensure that the agency releases "[a]ny reasonably segregable portion of a record," 5 U.S.C. § 552(b). *See Morley,* 508 F.3d at 1123.

**III.**

FOIA reflects "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976). And FOIA's exemptions are construed narrowly in keeping with its presumption in favor of disclosure. *Id.* at 361. The agency bears the burden of showing that a claimed exemption applies. *Loving v. Dep't of Defense*, 550 F.3d 32, 37 (D.C. Cir. 2008).

**A.**

Exemption 6 permits the withholding of "personnel and medical files and similar files" when the disclosure of that information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Similar files" is broadly construed to include "[g]overnment records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). In assessing the applicability of Exemption 6, courts "must weigh th[e] privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989) ("*NARFE*"). When an agency invokes Exemption 6, FOIA's strong presumption in favor of disclosure is at its zenith. *Jurewicz v. U.S. Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014).

**1.**

The threshold question for Exemption 6 is "whether disclosure of the files would compromise a substantial, as opposed to *de minimis*, privacy interest, because if no significant privacy interest is implicated FOIA demands disclosure." *Multi Ag Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (cleaned up). "Substantial," in this context,

"means less than it might seem. A substantial privacy interest is anything greater than a *de minimis* privacy interest." *Id.* at 1229–30 (internal quotation marks added).

The bulk of the Service's withholding are improper under Exemption 6 because the information does not implicate the licensee's personal privacy interest. For example, the reports' narrative sections contain the inspector's observations, and "if appropriate, indicates any deficiencies, documents noncompliant items, and cites the applicable regulation, a description of the problem, and a deadline to correct the non-compliant item." *See* Woods Decl. 1 ¶ 10(b). The Service has failed to convincingly explain how that information trammels on the licensees' personal privacy.

Exemption 6 "was designed to protect individuals from public disclosure of intimate details of their lives." *Rural Housing All. v. U.S. Dep't of Agric.*, 498 F.2d 73, 77 (D.C. Cir. 1974). The exemption, for example, protects "marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights, reputation, and so on." *Id.* And for closely held businesses, it extends to records that "would necessarily reveal at least a portion of the owner's personal finances." *See Multi Ag Media*, 515 F.3d at 1228–30. To state the obvious, these are all very intimate details that would rarely—if ever—be appropriate for the government to share with others. But "[t]he privacy exemption does not apply to information regarding professional or business activities." *Cohen v. EPA*, 575 F. Supp. 425, 429 (D.D.C. 1983). "This information must be disclosed even if a professional reputation may be tarnished." *Id.*

The Service contends that the Court should not employ "'an overly technical distinction' . . . 'between individuals acting in a purely private capacity and those acting in an entrepreneurial capacity.'" Def.'s Reply to Pl.'s Opp'n at 7, ECF No. 22 (quoting *Am. Farm*

*Bureau Fed'n v. EPA*, 836 F.3d 963, 970 (2016)).[7] But unlike the "names, home addresses, telephone numbers, GPS coordinates of homes, and information from which financial information could be gleaned" in *American Farm Bureau Federation*, 836 F.3d at 970–71, details about a business's compliance with regulations and statutes do not relate to intimate personal details, only business activities. And information about business judgments and relationships does not qualify for redaction. *See Sims v. CIA*, 642 F.2d 562, 575 (D.C. Cir. 1980). Indeed, Exemption 6 cannot be invoked "to protect the concerns of a contractor who would be embarrassed by disclosure of his responsibility for shoddy work." *Id.*

Even so, the Service argues that the licensees have privacy interests in the narrative sections because linking the licensees' names—which the Service already disclosed—with descriptions of noncompliant conduct can invite harassment and stigma. Woods Decl. 1 ¶ 49. In support, the Service cites licensees' descriptions of prior harassment. For example, a dog breeder from Missouri stated that he had received harassing phone calls after the Humane Society released his phone number. Woods Decl. 2 ¶ 6. And exhibitors complained about releasing location information "due to the fact the we are being victimized and harassed by the animal rights organization." *Id.* ¶ 8. These claims were submitted in response to predisclosure notifications to licensees concerning confidential commercial information in records subject to a different FOIA request. *See id.* ¶¶ 4–11.

In response, the Humane Society argues that the second-hand, unsubstantiated accounts in the Service's declaration are inadmissible hearsay. The Court agrees.

"[I]t is 'well-settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Bortell v. Eli Lilly & Co.*, 406 F. Supp. 2d 1, 11

---

[7] All citations are to the page numbers generated by this Court's CM/ECF system.

(D.D.C. 2005) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  And hearsay evidence generally is inadmissible.  *See* Fed. R. Evid. 802.  Hearsay is an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).

To be sure, courts may consider hearsay in FOIA cases when assessing the adequacy of the agency's search.  *See, e.g.*, *Niskanan Ctr., Inc. v. U.S. Dep't of Energy*, 328 F. Supp. 3d 1, 9–10 (D.D.C. 2018).  And FOIA declarants may rely on information obtained through inter-agency consultation.  *See, e.g.*, *Canning v. U.S. Dep't of State*, 134 F. Supp. 3d 490, 510 (D.D.C. 2015).  But it is a different matter to rely on out-of-court statements from private third-parties to justify an agency's withholding.  Other courts have refused to do so.  *See Brown v. Perez*, 835 F.3d 1223, 1231–33 (10th Cir. 2016) (holding that the government could not rely on a letter sent by a third-party company objecting that disclosure of certain information would cause competitive harm); *Pub. Citizen Health Research Grp. v. Nat'l Inst. of Health*, 209 F. Supp. 2d 37, 48 n.7 (D.D.C. 2006) ("Due to hearsay concerns, the Court does not rely on these letters in reaching its decision.").  So too here.

The Court invited the Service to submit non-hearsay documents in support of its claim.  *See* Order, ECF No. 26.  The Service declined, and instead argued that the accounts of past harassment in Ms. Wood's declaration are not hearsay because they are offered only to show the agency's "understanding of the privacy interests that justified withholding the information under Exemptions 6 and 7(C)."  Def.'s Surreply at 3–4, ECF No. 27; *see also* Hearing Transcript ("Tr.") at 9–12.  But that argument is unpersuasive.

Ultimately, it is the Court, not the agency, that must be satisfied with the propriety of a claimed FOIA exemption.  "An agency that has withheld responsive documents pursuant to a

9

FOIA exemption can carry its burden to prove the applicability of the claimed exemption by affidavit, and we review the agency's justifications therein *de novo*." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009); *see also Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) ("Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"). This review is different from the deferential arbitrary and capricious standard applicable to agency's exemption decisions in reverse-FOIA cases. *See* Tr. 9 (the Service conceding the point). And to find the Service's justification that licensees would be subject to harassment "logical" or "plausible" on *de novo* review, the Court would need to consider and credit the accounts of past harassment. The effect they had on the Service employees is irrelevant.

At the motions hearing, the Service suggested that "even if [the Court] were to strip out the hearsay statements in the declarations, [it] would still have a basis to justify the agency's" withholdings. Tr. at 12. Not true. "Exemption 6 [is] directed at threats to privacy interests more palpable than mere possibilities." *Rose,* 425 U.S. at 380 n.19. Without the accounts of harassment from the licensees, the declaration's justification for withholding the information is reduced to speculation and summary accounts of the hearsay. Nothing in Ms. Wood's declaration suggests that the agency has verified or confirmed any of these reports. At best, the Service has "established only the speculative potential of a privacy invasion without any degree of likelihood." *See Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 37 (D.C. Cir. 2002).

More, the Service has failed to "demonstrate that the information withheld logically falls within the claimed exemption." *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984). The cases concerned with potential harassment have focused on the agency withholding individuals' names, addresses, or financial information. *See, e.g.*, *NARFE*, 879 F.2d at 875–78. Indeed, the

individuals cited in Ms. Woods's declaration were concerned about the disclosure of phone numbers and location information. *See, e.g.*, Woods Decl 2 ¶¶ 6, 8. The Service released the licensees' names and now seeks to use Exemption 6 to shield information that would not otherwise constitute intimate personal details. This process is an end run around the principle that Exemption 6 does not protect business conduct, even potentially embarrassing details. *See Sims*, 642 F.2d at 575.

The licensees and third-parties, however, have more than a *de minimis* privacy interest in their names, addresses, and contact information.[8] The licensees here are homestead businesses, meaning that their business is co-located with their personal residence. *See* Woods Decl. 2 ¶ 16; Tr. at 43–44. "[T]he privacy interest of an individual in avoiding the unlimited disclosure of his or her name and [home] address is significant." *NARFE*, 879 F.2d at 875; *see also Am. Farm Bureau Fed'n*, 836 F.3d at 971 ("The disclosure of names, addresses, telephone numbers, GPS coordinates, and financial statuses can implicate substantial privacy interests."). The D.C. Circuit "has been particularly concerned when the information may be used for solicitation purposes" or "invite[] unwanted intrusions." *Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999); *NARFE*, 879 F.2d at 878. So courts have upheld withholding individuals' home addresses and contact information. *See, e.g.*, *NARFE*, 879 F.2d at 879; *Am. Farm Bureau Fed'n*, 836 F.3d at 971.

True, courts must consider the nature of the information withheld, and "personal privacy concerns necessarily are greater for an individual's home address than for his or her business address." *See Wash. Post Co. v. U.S. Dep't of Agric.*, 943 F. Supp. 31, 34–36 (D.D.C. 1996) ("*Wash. Post Co. II*"). But here the addresses are one and the same. And the fact that the nature

---

[8] The Service did not, however, withhold the names of the licensees. *See, e.g.*, Attachment H, ECF No. 19-1 at 94.

of the information is mixed, business and personal, does not eliminate all privacy interests.[9] *See, e.g.*, *Multi Ag Media*, 515 F.3d at 1228–30 (finding that people have a privacy interest in business records that might also reveal a portion of personal finances).

The Court finds that licensees retain more than a *de minimis* privacy interest in their home addresses, even though the interest may be diminished by the mixed nature of the address. Privacy concerns are especially strong when a FOIA request is directed at only a few homestead businesses because it increases the risk that the business-nature of the address is not the purpose for the request. *Cf. Wash. Post Co. II*, 943 F. Supp. at 34 ("[I]t is precisely because the list is so large and the information so generic that the individual privacy interests are so small."). Similarly, third parties retain a more than *de minimis* interest in their names, likeness, and personal information in the documents. *Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 29–30 (D.D.C. 2018).[10] Of course, a privacy interest alone may not be enough to satisfy the requirements of Exemption 6 because it must be weighed against the public interest in disclosure. *See Wash. Post Co. II*, 943 F. Supp. at 35.

Ultimately, the Court finds that while the licensees and third parties have a substantial privacy interest in their names, addresses, contact information, and personally identifying information, they have only a *de minimis* privacy interest in the other information withheld from the reports. And "[i]f no significant privacy interest is implicated . . . FOIA demands disclosure." *NARFE*, 879 F.2d at 874. Thus, the Service must disclose all reasonably segregable

---

[9] To find otherwise would disadvantage poorer licensees who cannot afford to buy or lease business space away from their homes.

[10] According to the Humane Society, the only third-party names that it seeks "are the redacted names of the attending veterinarians." Pl.'s Reply in Supp. of Cross-Mot. at 16, ECF No. 25.

portions of the records that do not include names, signatures, addresses, images, or contact and identifying information of the licensees and third-parties.

2.

Next, consider the public interest in disclosure of the licensees' addresses and third-parties' names. The only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to. *U.S. Dep't of Defense v. FLRA*, 510 U.S. 487, 497 (1994) (cleaned up). FOIA is not a tool for the public to police private citizens or businesses. *Id.* While some of the Humane Society's activities may cross that line at times, here the parties agree that "[t]he public has a significant interest in monitoring the agency's activities through inspection reports." *See Vaughn* Index at 2, ECF No. 18-18; Pl.'s Cross-Mot for Summ. J. ("Cross-Mot.") at 30–35, ECF No. 19.

The Humane Society, however, has not articulated how releasing licensees' addresses or third-parties' names would serve that public interest. The Humane Society argues that to effectively monitor the Service's implementation of the AWA, "it is important to tie an individual facility to an individual inspection report," and "an address is one way to identify a particular facility." Cross-Mot. at 37. Perhaps. But the Humane Society has all it needs to tie these records to particular facilities. The Service released the licensees' names and customer ID numbers. Indeed, the Humane Society made targeted requests using the licensees' certificate numbers, so there is no need for licensees' addresses to further tie the records to a particular facility. *See U.S. Dep't of State v. Ray*, 502 U.S. 164, 178 (1991) (finding that the public interest in disclosure was satisfied by redacted documents that the agency had already released).

The Humane Society's other arguments for needing the licensees' addresses are similarly unpersuasive. For example, it claims that addresses are important for determining whether the

13

Service is allowing multiple licensees to operate at the same facility, but there is no evidence that that is the case for the facilities at issue. "Mere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy." *Id.* at 179.

Nor is there a public interest in the release of veterinarians' names. The Humane Society contends that because "monitoring proper veterinary care is one of [the Service'] responsibilities under the AWA, it is important for the public to know which veterinarian a particular facility is using." Cross-Mot. at 39. Not so. Once the Service removes the improper redactions from the veterinary records and inspection reports, the Humane Society will have a wealth of information to evaluate the Service's monitoring of veterinary care. Knowing the veterinarian's name adds little if details about his care program and its implementation are known. *See Ray*, 502 U.S. at 178. Moreover, to the extent the Humane Society claims a facility may have an unlicensed veterinarian, the records appear to refute that. Woods Decl. 1, Ex. 6 at 54 (withholding the veterinarian's state license number). This is just more unpersuasive "[m]ere speculation." *Ray*, 502 U.S. at 179.

Because the licensees and third-parties have a significant privacy interest in their names, addresses, and personally identifying information, and because there is no public interest in that information, the balancing is easy. "[S]omething . . . outweighs nothing every time." *NARFE*, 879 F.2d at 879. The Service properly withheld the licensees' addresses and the names of third-party veterinarians under Exemption 6.

**B.**

Exemption 7(C) permits agencies to withhold "information complied for law enforcement purposes, but only to the extent that the production of such law enforcement records . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C.

§ 552(b)(7)(C). Whether records are "compiled for law enforcement purposes" depends on "how and under what circumstances the requested files were compiled . . . and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. U.S. Dep't of Justice*, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (internal citation and quotation marks omitted). For a mixed-function agency, like the Service—agencies whose functions include some law enforcement and some non-law enforcement duties—"a court must scrutinize with some skepticism the particular purpose claimed for disputed documents redacted under Exemption 7." *Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982).

According to the Humane Society, records are "compiled for law enforcement purposes" only when they are generated for a discrete investigation or enforcement action. *See* Cross-Mot. at 42–45. So it argues that routine inspections reports, like the records here, are not "compiled for law enforcement purposes" because "[t]he existence of an inspection report does not indicate that there is any particular enforcement or investigatory action occurring at all." *Id.* at 43.

The Service's inspection reports are routinized oversight not necessarily related to an investigation of alleged wrongdoing, but they may nonetheless qualify as law enforcement records.

The Humane Society points to an old case from this district that appears to prove its point. *See* Pl.'s Reply in Supp. of Cross-Mot. at 28–30, ECF No. 25. *Goldschmidt v. U.S. Department of Agriculture* held that routine inspection reports of meat and poultry plants were not protected by Exemption 7. 557 F. Supp. 274, 276–77 (D.D.C. 1983). The court relied on the D.C. Circuit's decision in *Rural Housing*, which distinguished between investigations for a possible violation of law and from customary surveillance of the performance of duties by government employees. *Id.* So the court in *Goldschmidt* reasoned that because the inspections

15

were "clearly routine administration," the reports were "not 'investigatory' records compiled as part of an inquiry into specific violations of law. Rather, they were more accurately described as records generated pursuant to 'routine administration, surveillance or oversight of Federal programs.'" 557 F. Supp. at 276 (quoting *Gregory v. FDIC*, 470 F. Supp. 1329, 1334 (D.D.C. 1979)).

But there have been significant changes to FOIA since *Goldschmidt*. Congress subsequently amended FOIA to expand Exemption 7's reach. "[I]n 1986, Congress amended [Exemption 7] to protect 'records or information compiled for law enforcement purposes,' deleting any requirement that the information be 'investigatory.'" *Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002). The effect of the amendment is that Exemption 7 "now applies more broadly." *North v. Walsh*, 881 F.2d 1088, 1098 n.14 (D.C. Cir. 1989). Indeed, "[i]t is clear that, under the amended threshold of Exemption 7, an agency may seek to block the disclosure" of materials generated by the agency "even when the materials have not been complied in the course of a specific investigation." *Tax Analysts*, 294 F.3d at 79.

Moreover, the D.C. Circuit has recognized that "[l]aw enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law." *Pub. Emps. for Envtl. Resp. v. U.S. Sect., Int'l Bdy. & Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014) ("*PEER*"). Indeed, the "ordinary understanding of law enforcement includes . . . proactive steps designed to prevent criminal activity and to maintain security." *Milner v. Dep't of Navy*, 562 U.S. 562, 582 (2011) (Alito, J., concurring). And it is irrelevant that the inspection reports are often used only for civil enforcement, because the "term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal." *PEER*, 740 F.3d at 203.

16

To be sure, "[t]he *Rural Housing* standard is still good law." *Tax Analysts*, 294 F.3d at 78. And the D.C. Circuit has recently stated that "[t]o qualify as law-enforcement records, the documents must arise out of 'investigations which focus directly on specifically alleged illegal acts . . . which could, if proved, result in civil or criminal sanctions.'" *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 64 (D.C. Cir. 2018) (quoting *Rural Housing*, 498 F.2d at 81). But *Bartko*, *Jefferson*, and *Rural Housing* all dealt with requests for records relating to the agencies' oversight of their own employees. *See Bartko*, 898 F.3d at 62–63 (considering a request for records from the Office of Professional Responsibility about a government employee's alleged misconduct); *Jefferson*, 284 F.3d at 174–76 (same); *Rural Housing*, 498 F.2d at 81–82 (distinguishing between investigatory files complied for oversight of employees and filed connection with investigations focused on specific alleged illegal acts). In other words, the agency was acting as an employer, not as law enforcement. Not so here.

These inspection reports relate to the Service's responsibility to enforce the AWA and ensure compliance by licensees, not oversight of employees. Routine inspection reports may not be "investigatory," but there is a "rational nexus" between the reports and the Service's law enforcement duties. *See Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003). The Secretary of Agriculture has delegated to the Service the authority to ensure compliance with and enforcement of the AWA "through inspections, enforcement, education, and cooperative efforts." *See* 7 C.F.R § 371.7.

The Service thus uses inspection reports to administer and enforce compliance with the AWA on an ongoing basis. Woods Decl. 1 ¶¶ 68, 70. If an inspector finds a deficiency that requires correction, he notes the applicable regulation, a description of the problem, and a deadline to correct the deficiency. *Id.* ¶ 9. And these inspection reports serve as the predicate

17

for any subsequent investigation of the licensee that could result in civil or criminal liability. *See id.* ¶¶ 12, 70–71. So inspection reports are related to the Service's delegated law enforcement authority.

Ultimately, this finding is of little help to the Service. Like Exemption 6, Exemption 7(c) requires balancing individuals' privacy interest against the public's interest in disclosure. *See Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984). Yes, "Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6." *U.S. Dep't of Justice v. Reports Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989). But even under Exemption 7(C)'s broader standard, the Service's withholding of the narratives and descriptions of noncompliant conduct is improper.

Recall that there is no personal privacy interest in "shoddy work," and the Service has not sufficiently shown a risk of harassment. More, the Humane Society has some interest in monitoring the Service by reviewing inspection reports. On balance, the Court finds that releasing information other than the licensee's addresses and third parties' names could not "reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

## C.

An agency must disclose "[a]ny reasonably segregable portion" of an otherwise exempt record. 5 U.S.C. § 552(b). An agency cannot withhold non-exempt portions of a document unless they "are inextricably intertwined with exempt portions." *Mead Data Central, Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 260 (D.C. Cir. 1977). And the government has the "burden of demonstrating that no reasonably segregable information exists within . . . documents withheld." *Loving*, 550 F.3d at 41. An agency is presumed to have complied with its obligation to disclose

non-exempt portions of the record. *Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1117 (D.C. Cir. 2007). Even so, a "district court must make specific findings of segregability regarding the documents to be withheld." *Id.* at 1116. "[T]he withholding agency must supply a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *King v. U.S. Dep't of Justice,* 830 F.2d 210, 224 (D.C. Cir.1987) (internal quotation marks omitted).

While some of the Service's withholdings were improper, the Court is satisfied by Ms. Woods's declaration and its *Vaughn* Index that the agency has otherwise met its obligation to segregate non-exempt material from the records. The Service "conducted a line-by-line analysis of each responsive document to determine whether any non-exempt material could be released," and "[w]here reasonably segregable non-exempt material was identified, it was released." Woods Decl. 1 ¶ 75. The Service's *Vaughn* Index further supplies the relatively detailed justification necessary to find that the Service has carried its burden.

The Humane Society complains that certain photographs could have been further unredacted. *See, e.g.*, Cross-Mot. at 46 (citing *Vaughn* index explanation for withholding of photos of veterinary records). But those photos were redacted because they included descriptions or depictions of noncompliant conduct. *See, e.g.*, *Vaughn* Index at 14–15. Because the Court has found that those withholdings were improper, the portions of the photos depicting or describing noncompliant conduct will be released. The Humane Society has not pointed to evidence that would otherwise overcome the presumption that the agency met its obligation. Thus, despite the Service's improper withholding of certain information, the Court finds that the Service has otherwise met its burden to release all reasonably segregable material.

## IV.

The Service properly withheld the licensees' addresses and contact information from the inspection documents. It also properly withheld third-parties' names, images, and personally identifying information. But the Service's other withholdings—dates, inspection narratives, animal inventories, and so on—were improper, and the Service must now disclose that information to the extent it is reasonably segregable from the information properly withheld.

For the foregoing reasons, the Plaintiff's Cross-Motion for Summary Judgment will be granted in part and denied in part, and the Defendants' Motion for Summary Judgment will be granted in part and denied in part. A separate order will issue.

Dated: June 3, 2019 TREVOR N. McFADDEN, U.S.D.J.